**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Terre Haute Division**

KENNETH EUGENE BARRETT                )
                                       )
            Plaintiff,                 )          Cause No.   2:20-cv-00596-JRS-DLP
                                       )
v.                                     )
                                       )
                                       )          ┌─────────────────────────────┐
                                       )          │           **FILED**          │
FEDERAL BUREAU OF PRISONS,             )          │                             │
                                       )          │        **11/10/2020**        │
MICHAEL CARVAJAL, Director             )          │                             │
Federal Bureau of Prisons             )          │      **U.S. DISTRICT COURT**   │
                                       )          │  **SOUTHERN DISTRICT OF INDIANA** │
and                                    )          │    **Roger A.G. Sharpe, Clerk**  │
                                       )          └─────────────────────────────┘
T.J. WATSON, Warden                    )
USP Terre Haute,                       )
                                       )
            Defendants.                )


**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Preliminary Statement**

1.      Plaintiff, Mr. Kenneth Barrett, is a death sentenced inmate confined at the federal penitentiary at Terre Haute, Indiana and has been so confined since 2005.  He suffers from a life-threatening illness, which was made known to Defendants at least as early as 2011.

2.      Defendants have refused to provide life-saving treatment to Plaintiff for his long-standing condition of chronic Hepatitis C ("HCV") and, by so doing, have violated accepted medical standards of care, as well as their own internal policies. This willful refusal has put Plaintiff at serious risk of pain, liver failure, cancer and ultimately death — despite the fact that there are medications that could cure Plaintiff with little to no side effects. Defendants' actions amount to a deliberate indifference to

1

Plaintiff's serious medical needs, in violation of the Eighth Amendment to the United States Constitution, U.S. Const. amend. VIII, and discrimination on the basis of disability, in violation of the Americans with Disabilities Act and Rehabilitation Act (ADA) (42 U.S.C. §12132), made applicable to confined persons in *Pennsylvania DOC v. Yeskey*, 524 U.S. 206 (1998). Accordingly, Plaintiff seeks declaratory and injunctive relief so that he can receive the medical treatment that he desperately needs.

## Jurisdiction

3.      This Court has subject matter jurisdiction over the allegations presented herein pursuant to 28 U.S.C. § 1331, in that the claim for injunctive relief arises under the United States Constitution and federal statutes, including the Administrative Procedure Act (APA), 5 U.S.C. § 702, which waives sovereign immunity for an action seeking relief other than monetary damages against an agency, as well as the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 and the Rehabilitation Act (RA), 29 U.S.C. § 794. The request for declaratory relief is based upon 28 U.S.C. § 2201, in that an actual controversy exists between Defendants and Plaintiff over the denial of services that are guaranteed by the United States Constitution.

## Venue

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts or omissions that give rise to Plaintiff's claim occurred and continue to occur in Vigo County, Indiana in the Southern District of Indiana.

## Parties

5.      The Plaintiff is Kenneth Eugene Barrett, a condemned prisoner housed at USP Terre Haute in the Special Confinement Unit. Mr. Barrett is challenging his death sentence through appeals currently pending in the Tenth Circuit Court of Appeals, Case #19-7049. As such, Mr. Barrett's

2

sentence of death is many years away from being carried out, if ever.  Mr. Barrett has been diagnosed with chronic HCV since at least 2011 but has never received treatment.

6.      Mr. Barrett has exhausted all administrative remedies prior to the filing of this request for relief. Defendants have ignored all such requests for treatment, and have denied all grievances based upon Mr. Barrett's requests for treatment. Due to defendants' refusal to provide the necessary medical treatment, and with the emergent nature of the potentially fatal disease, relief from this court is proper and appropriate, pursuant to the U.S. Const. amend. VIII, the ADA, the RA and the APA.

7.      Defendant Federal Bureau of Prisons ("BOP") is a federal law enforcement agency subdivision of the United States Department of Justice ("DOJ"), and is responsible for the administration of federal prisons, including USP Terre Haute. The BOP maintains physical custody of Plaintiff. The BOP is charged with establishing and carrying out policies and regulations that are safe, humane and secure for all federal penitentiaries.

8.      Defendant Michael Carvajal is the Director of the BOP. He is sued herein in his official capacity.

9.      Defendant T. J. Watkins is the current warden at USP Terre Haute. He is sued herein in his official capacity.

**Facts**

*A.  HCV and its Symptoms*

10.      HCV is a blood borne disease caused by the hepatitis C virus. The virus causes inflammation that damages liver cells, and is a leading cause of liver disease and liver transplants.

11.      HCV is transmitted by infected blood via several methods, including intravenous drug use and tattooing using shared equipment, blood transfusions with infected blood (typically before regular screening of donated blood began), and sexual activity.

12.     HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty-five to eighty-five percent of infected people will develop chronic HCV.

13.     Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

14.     People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to hepatocellular carcinoma (liver cancer).

15.     When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Of those with chronic HCV, the majority will develop chronic liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe.

16.     Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

### B. Standard of Care for HCV

17.     For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications, sometime required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other co-morbid diseases.

18.     In 2011, however, the Food and Drug Administration (FDA) began approving new oral medications, called direct-acting antiviral (DAA) drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

19.     These DAA drugs have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

20.     Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one-third of patients.

21.     The American Association for the Study of Liver Diseases (AASLD) and the Infectious Diseases Society of America (IDSA) have set forth guidelines ("the Guidelines") for the treatment of HCV, including guidelines for treatment in prison settings. *See* HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, available at https://www.hcvguidelines.org. These guidelines were most recently updated on August 27, 2020. *See id.*

22.     The Guidelines recommend as follows: Chronically infected individuals whose jail sentence is sufficiently long enough to complete a recommended course of antiviral therapy should receive treatment for chronic HCV infection according to AASLD/IDSA guidance while incarcerated. https://www.hcvguidelines.org/unique-populations/correctional. The bulk of this research was based upon a 2015 national survey. *See* Maurer K, Gondles EF, Efeti D, Strom HV, *Hepatitis C in correctional settings: challenges and opportunities*, 2015.  Article found at: http://www.aca.org/ACA_PROD_IMIS/Docs/OCHC/HCVinCorrectionalSetting_Final.pdf.

23.     In 2018, the World Health Organization (WHO) published its guidelines for treatment of HCV. *See* WHO, *Guidelines for the Care and Treatment of Persons diagnosed with Chronic Hepatitis C Virus Infection*, July 2018, ("WHO Guidelines"). Article found at: https://apps.who.int/iris/bitstream/handle/10665/273174/9789241550345-eng.pdf.  The WHO recommends additional preventative and proactive testing for at-risk populations, including adult prison populations.  *Id*. at xvii.  The 2018 guidelines that WHO set forth were based on three key developments that prompted change:

   a.   The generalized use of safe and highly effective direct-acting antiviral (DAA) medicine regimens for all persons improves the balance of benefits to harms of treating persons with little or no fibrosis, supporting a strategy of treating all persons with chronic HCV infection, rather than reserving treatment for persons with more advanced disease.

   b.   Several new, pangenotypic DAA medicines have been approved by at least one stringent regulatory authority, reducing the need for genotyping to guide treatment decisions.

   c.   The continued substantial reduction in the price of DAA regimens has enabled treatment to be rolled out rapidly in a number of low- and middle-income countries

"Together, these three factors have shifted the balance of benefits and risks in favour of treating all persons with chronic HCV infection with pangenotypic regimens."  *Id*. at 1-2.

6

With respect to treatment of confined persons, the WHO notes significant equity and human rights concerns.

> Therapeutic guidelines that restrict an individual's access to HCV treatment when cure rates are high and adverse events are rare raise ethical challenges *(105)*. Many HCV-infected persons from groups that are marginalized or stigmatized such as PWID, MSM, prisoners or migrants have poor access to health care. Progress towards a Treat All approach with equity in access regardless of age, risk group or stage of disease would help overcome some of the obstacles to access among these populations. Concerns that mandatory or coercive approaches might be used among highly affected marginalized populations highlight the importance of adequate information, informed consent, appropriate health worker training and rights-based legal frameworks to facilitate access.

*Id.* at 19.

### C. Current BOP Protocol

24.    The most recent BOP guidelines and policy for treatment of chronic HCV were issued in August 2018, entitled "Federal Bureau of Prisons Clinical Guidance, Evaluation and Management of Chronic HCV Infection," ("Protocol"), available at

https://www.bop.gov/resources/pdfs/hcv_infection_20180906.pdf.

25.    The Protocol refers to and echoes the AASLD/IDSA Guidelines' goal to "reduce all-cause mortality and liver-related health adverse consequences, including end- stage liver disease and hepatocellular carcinoma, by the achievement of virologic cure as evidenced by a sustained virologic response." *See* Protocol at 1.

26.    Applying the Guidelines, the Protocol further states that "All sentenced inmates with chronic HCV infection are eligible for consideration of treatment." *Id.*

27.    However, **unlike** the Guidelines, the Protocol sets out Priorities for treatment based on the BOP's assertion that "[c]ertain cases are at higher risk for complications or disease progression and may require more urgent consideration for treatment." *Id.* at 8.  These categories are "High,

7

Intermediate or Low." *Id.* at 8-9. The prioritization scheme relies largely on the "ASP-Platelet Ration or APRI score" and the level of liver fibrosis. *See id.*

28.     In addition, the Protocol sets forth additional specific criteria that an inmate must meet in order to receive treatment. *See id.* at 9. These include: 1.)  having no contraindications or drug interactions with treatment; 2.) not being pregnant; 3.) having sufficient time remaining on sentence to complete treatment; 4.)  having a life expectancy greater than 18 months, and 5.) being willing and able to adhere to rigorous treatment regimens and refrain from high-risk behaviors. *See id.*

29.     The prioritization system set forth in the BOP's Protocol is not in accordance with the accepted AASLD/IDSA Guidelines for treating HCV which advise treatment for all infected. *See, e.g., Stafford v. Robert E. Carter, Jr., Michael Mitcheff, M.D., Monica Gipson, R.N., Wexford of Ind., LLC*, No. 1:17-cv-00289-JMS-MJD (S.D. Ind. Sept. 13, 2018).

30.     Nor is the BOP's Protocol in accordance with the July 2018 WHO Guidelines.

### D.  Facts Specific to Mr. Barrett

31.     Mr. Barrett, age 59, has been incarcerated by the BOP since 2005.  He has chronic HCV and fibrosis of the liver.  His chronic HCV is a physiological disorder or condition that affects one or more of his body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. This physical impairment substantially limits one or more major life activity, including but not limited to walking, bending, sitting, lifting, and thinking; the operation of major bodily functions such as his digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of his liver.

32.     Mr. Barrett meets the essential eligibility requirements for the receipt of services or provided by the BOP, including but not limited to medical services.

33.    Mr. Barrett has chronic HCV and the BOP has been on notice of his condition since at least 2011. His viral loads have exceeded 10,000,000 U/L since 2016 and his liver enzymes have exceeded the acceptable range since at least 2012. He underwent a liver biopsy in 2012 and was identified then as having stage 2 fibrosis of the liver.

34.    Mr. Barrett's most recent bloodwork drawn on August 20, 2020, shows a continuing significant elevation in his liver enzymes. His AST (aspartate aminotransferase) is at a level of 151 (Normal range: 5-40) and his ALT (alanine aminotransferase) is at a level of 381 (Normal range: 7-56).

35.    Nonetheless, despite these symptoms, Defendants have denied Mr. Barrett treatment for this life-threatening condition.

36.    Moreover, Mr. Barrett meets all the eligibility requirements set forth in the BOP protocol for treatment, regardless of whether that Protocol comports with the AASLD/IDSA Guidelines and the WHO Guidelines. Mr. Barrett also is eligible for treatment under the AASLD/IDSA and the WHO Guidelines.

37.    Mr. Barrett has filed a minimum of seven grievances and appeals based on the denial of treatment beginning in 2012 up until the end of 2018. (These grievances and responses are attached as Exh. A.)

38.    Mr. Barrett's most recent grievance was initiated on September 4, 2018 and then appealed to the Regional Director. *See* Exh. A. The Regional Director found that Mr. Barrett met the Level 3 Priority criteria ("Low") and thus, would continue to be monitored only. *See id.* at Response 954875-R1.

39.    Mr. Barrett then appealed to the Central Office and received a response on January 29, 2019. This response recognized that "[t]he BOP expanded access to Hepatitis C treatment to all inmates in August 2018," and that "[a] liver biopsy on December 28, 2011 showed Stage 2 liver fibrosis which

meets Priority Level 2 criteria." *Id.* at Response 954875-A1. Nonetheless, despite recognizing that Mr. Barrett met Intermediate Priority for treatment, the Response remarkably concluded that "[b]ased on this information, there is no evidence to substantiate your claim of being denied appropriate medical care." *Id.*

40.    Mr. Barrett has thus exhausted all available administrative remedies to no avail.

41.    On February 20, 2019, Mr. Barrett's counsel requested Mr. Barrett's medical records from the BOP. The BOP sent a response received on March 4, 2019, stating that processing such requests could take six months. This request is still pending.

42.    On July 26, 2019, Mr. Barrett's counsel sent a letter to Defendant Watson demanding treatment for Mr. Barrett's HCV. Warden Watson never responded to the letter. (The letter and receipt thereof are attached as Exh. B.)

43.    On October 1, 2019, Mr. Barrett's counsel again sent a letter to Defendant Watson, demanding treatment for Mr. Barrett's condition, now informing Defendants of Mr. Barrett's intent to seek judicial relief if action was not taken within thirty days of signed receipt of said letter.  That letter was signed as received on October 3, 2019.  (Mr. Barrett's demand and proof of receipt are attached hereto as Exh. C.)

44.    Neither Defendant Watson nor Defendant BOP responded to that letter. Nor have Defendants initiated treatment for Mr. Barrett's HCV.

45.    The BOP's deliberate indifference to Mr. Barrett's serious medical needs has caused his quality of life to substantially deteriorate. He is at risk for developing further symptoms, further advanced liver failure, and even death.

46.    Despite Mr. Barrett qualifying for HCV treatment under the AASLD/IDSA Guidelines, the WHO Guidelines **and** even the BOP's own flawed guidelines, he continues to be denied treatment.

10

47.    Because the standard of care is to treat everyone, without regard to the stage of the disease, Defendants' written policy (even if it was followed) of only providing treatment to patients with the most advanced stages of the disease amounts to deliberate indifference to serious medical needs, in violation of the Eighth Amendment. It is not consistent with the standard of care. Delaying treatment until a patient is extremely sick has the perverse effect of withholding treatment from the patients who could benefit the most from it, because the treatment is less effective for patients with the most advanced stages of the disease.

48.    Mr. Barrett will continue to suffer, and his liver disease will continue to advance, unless he receives the DAA drug treatment.

## CAUSES OF ACTION

### COUNT I
### Eighth Amendment to the U.S. Constitution

49.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

50.    Defendants know about and enforce the policies and practices described herein. Defendants know of Plaintiff's serious medical needs, yet Defendants have intentionally failed and refused to provide treatment that will address those serious medical needs, knowing that those actions have resulted, and will continue to result, in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

51.    Defendants have caused the wanton infliction of pain upon Plaintiff and have exhibited deliberate indifference to the serious medical needs of Plaintiff, in violation of the Eighth Amendment.

52.    Defendants know, and have known, of the substantial risk of serious harm, and actual harms, faced by Plaintiff. Yet Defendants have disregarded, and continue to disregard, those risks and

11

harms by failing to provide the very medication that would alleviate those risks and harms. Defendants have been deliberately indifferent to the substantial risk of serious harm to Plaintiff.

53.     By denying Plaintiff his medically needed HCV treatment, Defendants have imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

54.     Defendants' denial of Plaintiff's medically necessary HCV treatment violates all standards of decency, contrary to the Eighth Amendment.

55.     Defendants' actions with respect to Plaintiff amount to grossly inadequate care.

56.     Defendants' actions with respect to Plaintiff are medical care so cursory as to amount to no medical care at all.

57.     As a direct and proximate cause of this pattern, practice, policy, and deliberate indifference, Plaintiff has suffered, and continues to suffer from harm and violation of his Eighth Amendment rights. These harms will continue unless enjoined by this Court.

## COUNT II
## Americans with Disabilities Act, 42 U.S.C. § 12131, et seq

58.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

59.     This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. and 42. U.S.C. § 12131 – 12134, and its implementing regulations.

60.     Defendant BOP is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

61.     Plaintiff has chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life

12

activity, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

62.     Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

63.     Plaintiff is regarded by the Defendants as having an impairment that substantially limits one or more major life activity, as Defendants perceive him as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f).

64.     Plaintiff is a qualified individual with a disability because he meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the BOP, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

65.     By withholding medical treatment from Plaintiff, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendants exclude Plaintiff from participation in, and deny him the benefits of BOP services, programs, and activities (such as medical services), by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

66.     By withholding medical treatment from Plaintiff, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendants subject Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

67.     Defendants fail to provide Plaintiff with equal access and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1). Defendants utilize criteria or methods of administration that have

13

the effect of subjecting Plaintiff to discrimination and that defeat or substantially impair accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

68.     Defendants have known about the violations noted herein but have failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

69.     As a direct and proximate cause of these actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights. These harms will continue unless enjoined by this Court.

**COUNT III**
**Rehabilitation Act, 29 U.S.C. §§ 791 – 794a**

70.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

71.     This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, et seq. and 29 U.S.C. §§ 791 – 794, et seq., and it implementing regulations.

72.     Defendant BOP is a program or activity receiving federal financial assistance. 29 U.S.C. § 794.

73.     Defendants exclude Plaintiff from participation in, and deny him the benefits of programs or activities, solely by reason of his disability. 29 U.S.C. § 794(a); 28 C.F.R. § 42.503(a).

74.     Defendants deny Plaintiff the opportunity accorded others to participate in programs or activities. 28 C.F.R. § 42.503(b)(1).

75.     Defendants have known about the violations noted herein but have failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

**76.**    As a direct and proximate cause of this exclusion, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights. These harms will continue unless enjoined by this Court.

## PRAYER FOR RELIEF

77.    WHEREFORE, Plaintiff respectfully requests that the Court provide the following relief:

78.    Exercise jurisdiction over this action;

79.    Issue appropriate declaratory and injunctive relief to stop the constitutional violations described above and to ensure that Plaintiff immediately receive appropriate treatment for his HCV, including treatment with direct-acting antiviral medications;

80.    Grant such other relief as this Court deems just and proper.


Dated:    11/10/2020                    Respectfully submitted,

                               /s/Kimberly M. Skaggs
                              Kimberly M. Skaggs
                              Attorney for Kenneth Eugene Barrett


## ATTACHMENTS

Exh. A.:    Plaintiff's Grievances, Appeals and Responses

Exh. B:    Plaintiff's Counsel July 26, 2019 Letter to Defendant Warden and proof of receipt of such letter

Exh. C:    Plaintiff's Counsel October 1, 2019 Letter to Defendant Warden and proof of receipt of such letter.

15